THE STATE v. DON FIKE, Appellant.—24 S. W. (2d) 1027.

Division. Two, February 19, 1930.

*P. M. Donnelly, C. H. Jackson* and *D. E. Moberly* for appellant.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

804

HENWOOD, C.—The defendant was charged with burglary and larceny, in the Circuit Court of Laclede County. The venue was changed to Texas County, where he was tried and found guilty of grand larceny and his punishment assessed at imprisonment in the penitentiary for two years. He was sentenced accordingly, and appealed.

The chief witness for the State was Joe McBride, the alleged accomplice of the defendant, who pleaded guilty and was sentenced to imprisonment in the penitentiary. According to his testimony, he and the defendant had been friends for several years. They met in Joplin, Missouri, during the latter part of April, 1927, and drove in an automobile to Carthage, Missouri; Ft. Scott, Kansas; Kansas City, Missouri, and then back to Springfield, Missouri. On the afternoon of April 28, 1927, the day of the alleged offense, they drove in the defendant's Master-Six Buick touring automobile from Springfield to Lebanon, Missouri, in Laclede County, and then on to Rolla, Missouri. They returned to Lebanon about 1:30 or two o'clock that night, and there stopped the automobile in front of Nelson's gasoline filling station. With a tire tool, taken from the automobile, he pried open a rear window of the building used in connection with the filling station and entered the building through the open window, while the defendant stayed in the automobile, with the engine running. He opened the front door of the building from the inside and took from the building and placed in the automobile a number of automobile tire-casings and tubes. They drove to Carthage, then to Ft. Scott, and then on to a point near Yates Center, Kansas, where they met his brother, Homer McBride, about eleven o'clock in the morning. Shortly before, they stopped in that vicinity and the defendant telephoned his brother to meet them. They offered to exchange the casings, or a part of them, with his brother for the defendant's check in the sum of $100, which the defendant had given his brother a few days before in an automobile trade. The defendant told his brother that they got the casings from the "Tracey boys." His brother declined to make the deal and he and the defendant drove back to Sedalia, Missouri, reaching there about 6:30

that afternoon. They left the automobile, with the casings and tubes in it, at a garage in Sedalia and engaged a room in a rooming house. The next morning, they took the casings and tubes from the automobile and put them in their room in the rooming house. A day or two later, they were arrested in Sedalia on another charge, and, while they were confined in jail, the officers removed the casings and tires from the rooming house to the prosecuting attorney's office. On cross-examination, he admitted that, after he and the defendant were arrested in Sedalia, he told Judge Couey, Prosecuting Attorney of Pettis County, that the defendant was not with him when he got the casings and tubes; and that he took the defendant's car from its parking place in front of defendant's rooming house in Springfield, and drove to Lebanon and got the casings and tubes, without the defendant's knowledge.

According to the testimony of the other witnesses for the State, the defendant and Joe McBride traded a Chevrolet automobile to Homer McBride for the Master-Six Buick at Iola, Kansas, near Yates Center, about a week or ten days before the casings and tubes in question were taken. As a part of the consideration for the trade, the defendant gave Homer McBride his check for $100, and requested him to hold the check for a while. Thereafter, when the defendant and Joe McBride returned to Kansas and offered to exchange the casings and tubes, or a part of them, for this check, the defendant told Homer McBride they got the casings and tubes from "Tracey at Plato." The defendant was seen in Rolla on the evening of April 27, 1927, in a Buick car and in company with another young man. About five o'clock on the following morning, it was discovered that a rear window of the building at Nelson's filling station in Lebanon had been pried open, during the night, and that ten or twelve automobile tire-casings and tubes, of the total value of $250, had been taken from the building. There were marks on the lower sill and sash of the window and the window latch was broken. When the defendant and Joe McBride were questioned by the Sheriff of Pettis County and the Chief of Police of Sedalia, following their arrest, the defendant said that he did not participate in the taking of the casings and tubes; and that he loaned his car to Joe in Springfield for about thirty minutes and Joe came back with the casings and tubes in the car. Then, in the presence of these officers, he said to Joe: "You take the fall for this and let me out, and I will get you out. I can get you out if you will just relieve me." A few days later, the defendant came to Lebanon, in company with his father and an attorney, and had a conversation with Nelson, the owner of the filling station and the stolen casings and tubes. The defendant told Nelson that he had been arrested and charged with

participation in this offense, but was innocent, and, if Nelson would not prosecute him, he would tell him where the missing casings and tubes were. Nelson told the defendant that he would not prosecute an innocent man. The defendant then told Nelson that the casings and tubes were in the prosecuting attorney's office in Sedalia, and that he and Joe McBride had "swapped off" two of the casings for smaller ones for use on the defendant's car. The defendant and his father offered to pay Nelson for the casings and tubes. Not long thereafter, Nelson went to Sedalia with the defendant and Joe McBride, and there, in the prosecuting attorney's office, saw eight of the casings and eighteen of the tubes which had been taken from the building at his filling station. He identified them by the cost marks thereon, in his handwriting. They were the casings and tubes which had been found in the room occupied by the defendant and Joe McBride in Sedalia at the time of their arrest. Sometime after Joe McBride had been taken to the penitentiary, but before the defendant was tried, the defendant went to the home of McBride's parents in Laclede County and inquired of them as to what Joe McBride had said concerning him. When told that Joe said he was with him at the filling station the night the casings and tubes were taken, the defendant said: "I wasn't in the building with Joe. I was off down the road."

The defendant took the stand in his own behalf and testified at length. He denied that he had any part in the taking of the casings and tubes. He admitted that he was with Joe McBride, in Kansas, when the Chevrolet automobile was traded to Joe's brother, Homer McBride, for the Buick; and that he had an interest in the Chevrolet and gave Homer his check for $100, as a part of the consideration for the trade. He said that he and Joe drove through Rolla in the Buick on their return trip from Kansas, at that time, but he was not in Rolla nor with Joe on the night of April 28, 1927. He further testified that he stayed at "Charley Clark's" in Springfield on the night of April 27, 1927, and at the home of Walter Finley in Springfield, the night in question, the night of April 28, 1927; that, while he was talking to Tom Campbell, an employee at a gasoline filling station in Springfield, on the morning of April 29, 1927, Joe McBride came there in the Buick and had the casings and tubes in the car; that the Buick had been out of his possession for three or four days; that Joe told him he was going to take the casings and tubes to his brother, Homer, in Kansas, and stay there and work for Homer, and, if he (the defendant) wanted to use the Buick, he would have to go along and drive it back; that he went along for the purpose of driving the car back; that Joe tried to sell or trade the casings and tubes to Homer, but he (the defendant) took no

part in that conversation; that he did not know there was anything wrong in connection with the casings and tubes until Joe told him, after they returned to Sedalia, that "the tires might not be as straight as they ought to be;" that thereupon, he said to Joe: "You can't take them any farther then in that car, Joe, if that's the case;" that he did not take any part in putting the casings and tubes in the room in Sedalia; that, in the presence of the officers at Sedalia, he said to Joe: "You may just as well go on and claim those tires, you know they are yours;" that he did not make the statement attributed to him by the officers, quoted above; that he did not tell Joe's parents he was "off down the road" when Joe got the tires; that Joe's mother asked him if he was with Joe when Joe got the tires and he told her he was in Springfield and could prove it; and that the conversation with Joe's parents concerning this matter arose when Joe's father tried to get him to plead guilty.

Judge E. W. Couey, Prosecuting Attorney of Pettis County, testified that, after the arrest of the defendant and Joe McBride in Sedalia, Joe McBride told him that the defendant stayed in a rooming house in Springfield the night he (McBride) got the tires; that he (McBride) took the defendant's car from its parking place in front of the rooming house and went to Lebanon and got the tires at Nelson's filling station and returned to Springfield; and that the defendant was not with him and knew nothing about the taking of the tires.

The testimony of the defendant was corroborated, in part, by Charley Clark, Walter Finley and his wife, and Tom Campbell. Charley Clark said the defendant stayed with him at his (Clark's) rooming house in Springfield the night of April 27, 1927. On cross-examination, he said the defendant did not take any car to the rooming house. Walter Finley and his wife said that the defendant stayed at their home in Springfield from seven or eight o'clock in the evening of April 28, 1927, until about 6:30 the next morning. Tom Campbell said that the defendant came to the gasoline filling station in Springfield, where he (Campbell) was employed, about eight o'clock in the morning of April 29, 1927, and remained there until about 9:30, when another man came there in the defendant's Buick car, and the defendant left there in the car with the other man.

I. It is urged that the evidence fails to show that the casings and tubes stolen from the filling station were the casings and tubes charged to have been stolen; in other words, that there is a variance between the charge and the proof.

It is true that the casings and tubes alleged to have been stolen, eight casings and twenty-six tubes, are described in the information as to size and name or label. It is also true that the casings and tubes shown to have been stolen were not so described or identified by any witness in the case. But, it does appear, from direct and positive evidence offered by the State, that ten or twelve casings and about thirty tubes were stolen from the filling station by the defendant and Joe McBride, at the time alleged, and that eight of said casings and eighteen of said tubes were later found in the possession of the defendant and Joe McBride. The record further shows that the defendant made no objection to the introduction of this evidence on the ground of a variance, nor on any other ground, and that, throughout the progress of the trial, counsel and witnesses, both for the State and the defendant, treated the casings and tubes shown to have been stolen as the casings and tubes alleged to have been stolen. Our statute of jeofails (Sec. 3907, R. S. 1919) provides that—''Whenever on the trial of any felony or misdemeanor, there shall appear to be any variance between the statement in the indictment or information and the evidence offered in proof thereof, . . . in the name or description of any matter or thing whatsoever therein named or described, such variance shall not be deemed grounds for an acquittal of the defendant, unless the court before which the trial shall be had shall find that such variance is material to the merits of the case and prejudicial to the defense of the defendant.'' The defendant did not complain of a variance until he filed his motion for a new trial. It was too late then, after the verdict, to make such complaint. [State v. Ballard, 104 Mo. 634, 16 S. W. 525; State v. Foley, 247 Mo. 607, 153 S. W. 1010; State v. Small, 272 Mo. 507, 199 S. W. 127.] See also State v. Tracy, 294 Mo. 372, 243 S. W. 173; State v. Hedgpeth, 311 Mo. 452, 278 S. W. 740; State v. Broyles, 317 Mo. 276, 295 S. W. 554. The question of whether or not a variance between the charge and proof is material to the merits of the case and prejudicial to the defense of the defendant rests primarily in the discretion of the trial court. In this case, the trial court was not even given an opportunity to pass upon that question, at the proper time, and, therefore, it is not a proper question for our consideration. However, it may be well enough to say that the trial court would not have abused its discretion in finding that there was no material variance in this case, had the question of variance been properly and timely raised, and that the trial court did not abuse its discretion in overruling the motion for a new trial, in which the defendant alleges a variance,

II. It is also urged that the prosecuting attorney caused the jury to become prejudiced against the defendant by stating and insinuating, in his cross-examination of the defendant's witnesses, that the defendant "had been engaged in a series of bank robberies," and that the trial court erred in refusing to grant the defendant a new trial on that ground.

The only statements or insinuations of this character by the prosecuting attorney are found in the cross-examination of the defendant's witness, Charley Clark. In this connection, the record discloses the following proceedings:

"Q. Mr. Clark, at the time Mr. Fike was over there, was there a bank robbed over there? A. No, not that I remember of.

"Q. Did you hear anybody accused of robbing a bank? A. No.

"By Mr. Donnelly: We object to that.

"By the Court: I don't know what the purpose of it is, if it is for the purpose of fixing dates, it is admissible, but if it is for the purpose of connecting this defendant with it, it wouldn't be.

"By Mr. Bowron: Yes, I expect to follow it up. I can connect it right now.

"Q. Did you hear that this defendant was connected with the robbing of a bank over there?

"By Mr. Donnelly: We object to that and ask that the jury be instructed not to consider that in making up their verdict.

"By the Court: The objection is sustained, and the jury are instructed not to consider that in making up their verdict."

The insinuations of the prosecuting attorney, by this line of inquiry, that the defendant had been connected with a bank robbery were highly improper, and the court so ruled, in effect. The court not only sustained the defendant's objections to these insinuations, but, upon the defendant's request, instructed the jury to disregard them. Indeed, the court did everything the defendant requested, in an effort to remove from the minds of the jury the prejudicial effect, if any, of these insinuations. Under these circumstances, the trial court committed no error in refusing to grant the defendant a new trial, nor would we be justified in reversing the judgment, on that ground. [State v. Taylor, 293 Mo. 1. c. 217, 218, 238 S. W. 1. c. 491; State v. Keller (Mo. Sup.), 281 S. W. 1. c. 963.]

III. It is further contended that the trial court erred in refusing to give the defendant's Instruction C, relating to the defense of *alibi*, interposed by the defendant in this case. By the defendant's given Instruction 7, the jury were fully and properly advised as to the defense of *alibi*, and this instruction is the same in substance and legal effect as the defend-

ant's refused Instruction C. It was clearly the duty of the trial court to properly instruct the jury on the defense of *alibi* in this case, when requested to do so, but, having discharged that duty by giving the defendant's Instruction 7, it is equally clear that no error was committed in the refusal of the defendant's Instruction C, which covered the same matter. [State v. Baldwin (Mo. Sup.), 281 S. W. 940; State v. Williams, 309 Mo. 155, 274 S. W. 427.]

Our examination of the record discloses no prejudicial error, either in the record proper or the trial proceedings. The judgment is accordingly affirmed. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.